# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EUCHARIA N. ANAKOR        )
                           )
      **Plaintiff,**           )
                           )
      v.                   )    **Case No. 12-cv-428 (RJL)**
                           )
KATHERINE ARCHULETA     )
                           )
      **Defendant.**          )

**FILED**

FEB 1 0 2015

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(February _9_ , 2015) [Dkt. #28]

Plaintiff Eucharia Anakor ("plaintiff or "Anakor"), a Nigerian woman, brings this suit against Katherine Archuleta[1] in her official capacity as Director of the United States Office of Personnel Management ("defendant" or the "Agency"). *See* Compl. [Dkt. #1]. Anakor alleges unlawful discrimination on the basis of national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, ("Title VII"); unlawful discrimination based on caregiving responsibilities in violation of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.*, ("ADA"); and retaliation for participating in protected Equal Employment Opportunity ("EEO") activity in violation of Title VII. Compl. ¶¶ 42-64. Before me now is defendant's Motion for Summary Judgment. Def.'s Mot. for Summ. J. ("Def.'s Mot.") [Dkt. #28]. After review

---

[1] Director Archuleta is automatically substituted as the defendant in this case as the successor to John Berry as the Director of the United States Office of Personnel Management. *See* Fed. R. Civ. P. 25(d).

of the motions, the applicable law, and the record herein, defendant's motion is GRANTED.

## BACKGROUND

Anakor began working with the Office of Personnel Management's ("OPM") Federal Investigative Services Division in January 2008.  Feb. 19, 2014 Deposition of Eucharia N. Anakor, Def.'s Mot., Ex. 1 ("Anakor Depo.") at 16:14-21 [Dkt. #28-1].  The Division conducts background checks on individuals seeking federal security clearances or public trust positions.  Def.'s Statement of Mat. Facts Not in Dispute ¶ 8 ("Def.'s SOMF") [Dkt. #28].[2]

Anakor was hired into a two-year internship as a special agent/federal investigator, during which she was a probationary employee and received formal training to learn the duties of a special agent.  Anakor Depo. at 19:9-20:7.  She understood that her intern position was temporary, with no guarantee that she would be converted to a permanent employee.  *Id.* at 63:21-24.  Indeed, the Federal Career Intern Program Agreement Anakor signed with the Agency explicitly stated that "[t]he employer will consider an eligible intern for conversion to a permanent position upon successful completion of the two-year internship period. . . . **[N]o assurance of permanent employment can be made and none is implied**." Def.'s Mot., Ex. 2 [Dkt. #28-1].

New intern hires, including Anakor, received group and individualized training on their duties.  Interns new to the Agency at the time plaintiff joined attended a pre-academy class, a basic investigator course, and spent time with a mentor or training

---

[2] *See* Pl.'s Opp'n at 3 ("Plaintiff has no dispute with Defendant's statement of facts ¶¶ 1-10.").

agent. Sept. 5, 2013 Deposition of Lyndsey Hovde,[3] Def.'s Mot., Ex. 5 ("Hovde Depo.")
at 10:6-15 [Dkt. #28-2]; *see also* Anakor Depo. at 24:14-25:5, 32:16-23; Def.'s Mot., Ex.
6 [Dkt. #28-2].  Once through initial training, intern investigators were sent out into the
field to conduct interviews with subjects and sources. *See* Def.'s Mot., Ex. 6.

During the course of Anakor's internship, one of her children was diagnosed with
kidney disease. Anakor Depo. at 37:5-8.  In September 2008, shortly after her child was
diagnosed, Anakor requested a transfer to Alabama. *Id*. at 36:22-37:13.  Her request for a
permanent transfer was denied. *Id*. at 37:11-15.  However, her request for a temporary
duty assignment to Alabama was granted for three months, and later extended by an
additional month. *Id*. at 39:3-18.  She returned to her home field office and did not
request any further extension of the temporary assignment. *Id*. at 39:19-21.  She was told
that she could request leave under the Family and Medical Leave Act, but she did not
request such leave. *Id*. at 96:18-99:7; Def.'s Mot., Ex. 26 [Dkt. #28-3].  Plaintiff
continued to work from her Virginia field office until the end of her two-year internship.

Investigators, including investigator interns, are evaluated based on four elements
of their work: quality, timeliness, productivity, and investigative competencies. *See, e.g.*,
Def.'s Mot., Ex. 3 [Dkt. #28-1].  All four elements are considered "critical elements"
such that "if someone performs unsuccessfully, the entire rating is unsuccessful
regardless of the other ratings on the other elements." July 22, 2014 Deposition of
Patrick Green, Def.'s Mot., Ex. 4 at 52:9-22 [Dkt. #28-1].

---

[3] Lyndsey Kaplansky served as Anakor's supervisor while she worked at the Agency. Anakor Depo. at
96:9-10.  Kaplansky later changed her last name to "Hovde." Def.'s Mot. at 3 n.1. This Opinion refers to
her as "Kaplansky," but her deposition was taken under the last name "Hovde."

One way investigators are assessed is through the completion of "check rides," or observed field interviews.   As plaintiff explained, a check ride is "a period of observation for the supervisors to go out with an investigator to observe the investigator and make sure that the required questions are being asked and the investigator is following OPM policies and procedures while conducting an investigation out in [the] field." Anakor Depo. at 43:10-15.

Investigators also create reports after their interviews, which are reviewed internally and externally by those using the reports to adjudicate security clearances and may be returned to the investigator for elaboration or correction if deficient.  Hovde Depo. at 127:19-128:5.  Deficiencies can include failure to interview certain people, failure to obtain necessary records, or failure to resolve an issue that arose during the course of the background investigation. *Id.* at 127:9-18.  A retuned report means "the report is not complete and therefore an adjudicator would not be able to determine the person's suitability based on the report that is provided." *Id.* at 128:18-21.

Both Anakor's reports and check rides exposed flaws in her investigations while she was an intern investigator.  Throughout plaintiff's time as an intern, multiple reports were returned to her to correct deficiencies, particularly to add necessary information plaintiff either had not asked or had not recorded the first time around. *See* Def.'s Mot., Exs. 12-15 [Dkt. #28-3]; Hovde Depo. at 128:6-15.

Plaintiff's check ride assessments repeatedly documented that she failed to meet expectations in multiple ratings categories, including her "[a]bility to frame questions and elicit information" and "[k]nowledge of case coverage requirements." *See* Def.'s Mot.,

4

Exs. 7-11 [Dkt. ##28-2, 28-3]. Her evaluators noted that she failed to ask "must ask"

questions, Def.'s Mot., Exs. 9-11, and often had difficulty communicating with her

subjects, such that the subjects could not understand her questions or she could not

understand their answers, Def.'s Mot., Exs. 8-9; *see also* Hovde Depo. at 57:2-5, 58:20-

59:19, 60:8-17. Her evaluators also expressed concern with, among other things, the time

it took for her to conduct her interviews, her failure to follow up on necessary

information, and her dependence on aids to remember the necessary questions. Def.'s

Mot., Exs. 7-11. Anakor concedes that she had issues with her reports and check rides,

Anakor Depo. at 55:16-56:12, 65:10-66:14, and noted in her own self-evaluation and

development plan that she needed to reduce returned cases and improve the quality of her

work, Def.'s Mot., Exs. 16-17 [Dkt. #28-3].

     Anakor's performance shortcomings were recorded in evaluations of her work.

Her April 2009 Progress Review Certification noted that her "performance in the Quality

element has been assessed at the Unsatisfactory level." Def.'s Mot., Ex. 18 [Dkt. #28-3].

In her performance appraisal for the fiscal year ending September 30, 2009, delivered in

October 2009, Anakor received ratings of "fully successful" in the timeliness,

productivity, and investigative competencies categories, but a rating of only "minimally

successful" in the quality category. Def.'s Mot., Ex. 19 [Dkt. #28-3]. The performance

summary attached to her appraisal indicated that she did not in fact meet the requirements

for "minimally successful" quality, because the percentage of her reports rated adequate

or better throughout the year did not reach the necessary threshold. Def.'s Mot., Ex. 19.

However, the performance appraisal noted some improvement, so "her rating [was]

mitigated to minimally successful." *Id.*; *see also* Def.'s Mot., Ex. 20 ("Based on the

numbers alone, [her] rating would have been Unsatisfactory . . . ."). Her overall

cumulative rating for the 2009 fiscal year was "minimally successful." Def.'s Mot., Ex.

19.

Despite the indication of quality improvements noted in her performance

appraisal, Anakor continued to perform unacceptable interviews as noted in her check

rides during the period between her 2009 fiscal year appraisal and the end of her two-year

internship.  She performed three check rides during that time: November 18, 2009,

December 2, 2009, and December 17, 2009.  Def.'s Mot., Exs. 9-11.  All three were

evaluated as "unacceptable."  *Id.*; *see also* Anakor Depo. at 65:17-19 (Q: Do you know if

your performance was downgraded from minimally successful to unacceptable?"  A:

Yes.").  The evaluation of her last check ride reached the conclusion that "Agent Anakor

still made mistakes that should not be made of an Agent who has been conducting

investigations for just under two years."  Def.'s Mot., Ex. 11.

On January 4, 2010, Anakor received a letter advising her that she would "not be

converted to a permanent position based on [her] unacceptable performance" and her

appointment would be terminated the next day, upon the completion of her two-year

internship.  Def.'s Mot., Ex. 21 [Dkt. #28-3].  The letter indicated that "[f]rom October 1,

2009 to January 4, 20[10], [her] performance has declined to an Unacceptable level."  *Id.*

Plaintiff now alleges that her failure to be converted to a permanent employment

position was the result of unlawful discrimination on the basis of her national origin and

caregiving responsibilities, and also was retaliation for engaging in protected EEO

6

activity.[4]  Compl. ¶¶ 42-64.  Defendant moves for summary judgment on all counts.
Def.'s Mot.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if
the movant shows that there is no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g., Celotex Corp.
v. Catrett*, 477 U.S. 317, 322-23 (1986).  The substantive law determines which facts are
"material," in that they might affect the outcome of the suit, and a dispute over such facts
is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for
the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"When determining whether summary judgment or judgment as a matter of law is
warranted for the employer, the court considers all relevant evidence presented by the
plaintiff and defendant." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C.
Cir. 2008).  The Court draws all justifiable inferences in favor of the non-moving party.
*Anderson*, 477 U.S. at 255.  Summary judgment is, however, appropriate "against a party
who fails to make a showing sufficient to establish the existence of an element essential
to that party's case, and on which that party will bear the burden of proof at trial."
*Celotex*, 477 U.S. at 322.  A non-moving party must establish more than the "mere

---

[4] In the Complaint, plaintiff based her claims of discrimination on her failure to be converted, which she
calls "termination." Compl. ¶¶ 43, 50, 62.  Defendant challenged other possible adverse actions
referenced in the Complaint in the motion for summary judgment, *see generally* Def.'s Mot., but plaintiff
engaged only on the termination issue, *see generally* Pl.'s Opp'n to Def.'s Mot. for Summ J ("Pl.'s
Opp'n") [Dkt. #38].  To the extent any additional adverse actions were alleged, the Court treats them as
conceded, and focuses on plaintiff's failure to be converted to a permanent employee as the adverse
employment action in question. *See Potter v. Toei Animation Inc.*, 839 F. Supp. 2d 49, 53 (D.D.C.) *aff'd*,
No. 12-5084, 2012 WL 3055990 (D.C. Cir. July 18, 2012).

existence of a scintilla of evidence" in support of her position. *Anderson*, 477 U.S. at

252; *see also id.* at 249-50 ("If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted." (citations omitted)). Further, a

plaintiff's "[s]elf-serving testimony does not create genuine issues of material fact" to

survive summary judgment. *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105

(D.D.C. 2007); *see Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008).

## ANALYSIS

Anakor brings a Title VII discrimination claim, an ADA discrimination claim, and

a Title VII retaliation claim. All three claims are analyzed using the framework

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McDonnell*

*Douglas Corp.*, 411 U.S. at 802-05 (developing framework in a racial discrimination

case); *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003)

(applying framework to retaliation case); *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284,

1288 (D.C. Cir. 1998) (applying framework to ADA case). A plaintiff must first

establish a prima facie case of discrimination or retaliation. *See McDonnell Douglas*, 411

U.S. at 802. The burden then shifts to the employer to articulate a legitimate, non-

discriminatory and/or non-retaliatory reason for the adverse employment action. *See id.*

If it succeeds in doing so, the burden shifts back to plaintiff to demonstrate that the

proffered legitimate reason was, in fact, pretext for a prohibited reason. *See id.* at 804.

This Circuit has recognized that if an employer is moving for summary judgment

or judgment as a matter of law in a case like this one, "the employer ordinarily will have

asserted a legitimate, non-discriminatory reason for the challenged decision." *Brady*, 520

F.3d at 493. When that is the case, "the question whether the employee actually made out

a prima facie case is no longer relevant and thus disappears and drops out of the picture."

*Id.* at 493 (internal quotation marks and alterations omitted).

> [T]he district court need not-*and should not*-decide whether
> the plaintiff actually made out a prima facie case under
> *McDonnell Douglas.* Rather, in considering an employer's
> motion for summary judgment or judgment as a matter of law
> in those circumstances, the district court must resolve one
> central question: Has the employee produced sufficient
> evidence for a reasonable jury to find that the employer's
> asserted non-discriminatory reason was not the actual reason
> and that the employer intentionally discriminated against the
> employee on [a prohibited basis]?

*Id.* at 494. The same approach applies to Title VII retaliation claims and to ADA

discrimination claims. *Hairston v. Vance-Cooks*, 773 F.3d 266, 275 (D.C. Cir. 2014)

(retaliation); *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)

(ADA discrimination).

Although the elements required to make out a prima facie case differ from a Title

VII disparate treatment claim to an ADA discrimination claim to a Title VII retaliation

claim,[5] all three claims in this case arise out of one adverse employment action: failure to

convert plaintiff to permanent status. And the Agency, as the employer, has offered a

legitimate, non-discriminatory and non-retaliatory reason for that action: unacceptable

job performance.

Therefore, the Court must analyze whether Anakor produced evidence sufficient

---

[5] *Compare Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (Title VII discrimination) *with Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997) (ADA association discrimination) *with Hairston v. Vance-Cooks*, 773 F.3d 266 (Title VII retaliation).

for a reasonable jury to find that the Agency's stated reason for declining to convert her to a permanent employee was not the actual reason, and instead the actual reason was either (1) discrimination against her on the basis of her national origin; (2) discrimination against her because of her association with a disabled person; or (3) retaliation against her for protected EEO activity.

Anakor's attempts to argue that her performance was not the actual reason for her failure to be converted into a permanent employee do not pass muster. The Agency's stated legitimate, non-discriminatory and non-retaliatory reason for its employment decision is supported by significant evidence in the record. Anakor's shortcomings in her job performance are well-documented in the record and described summarily above. In short, she was terminated after a "minimally successful" rating at the end of FY 2009, followed by three "unacceptable" check rides. Def.'s Mot., Exs. 9-11, 19, 21.

When asked what her basis was "for alleging that the decision not to convert [her] to full-time employment was a form of discrimination," Anakor responded, "I believe that in the two years that I was there, . . . that I had gained the knowledge, the skills, the investigative competence that's required for that position." Anakor Depo. 65:3-9. Unfortunately for plaintiff, the evidence in the record indicates otherwise, and her own self-serving assessment of her skills does not create a genuine issue of material fact. *Fields*, 520 F. Supp. 2d at 105; *Stoyanov v. Winter*, 643 F. Supp. 2d 4, 14 (D.D.C. 2009) ("[P]laintiff cannot establish pretext simply based on his own subjective assessment of his own performance, for plaintiff's perception of himself, and of his work performance,

is not relevant. It is the perception of the decisionmaker which is relevant." (internal

quotation marks omitted)).

Further, Anakor has not offered sufficient evidence to support any of her claims

that the actual reason for the Agency's decision not to convert her was a prohibited one.

## I.    *National Origin Discrimination*

There is no evidence from which a jury could find that the Agency decided not to

convert Anakor to a permanent employee based on her Nigerian origin.  Anakor argues

that she was not treated the same way as a similarly-situated employee, Rebecca

Thompson ("Thompson"), who was not of Nigerian origin.  Pl.'s Opp'n at 7.  Thompson

was rated "minimally successful" in her annual performance evaluation in October 2009.

Hovde Depo. at 154:8-12.  She subsequently was converted to a permanent employee.

*Id*. at 154:13-16.  Gwendolyn Ferebee, an African-American female, also was rated

"minimally successful" in her October 2009 evaluation and had her status converted.  *Id*.

at 154:8-12, 154:17-155:2.

Kaplansky testified that both women improved significantly following their

October 2009 evaluations.  *Id*. at 155:3-9.  Anakor's argument relies specifically on the

treatment of Thompson, and the evidence in the record supports Thompson's

improvement.  On a November 12, 2009 check ride, Thompson's evaluator graded her as

"meets expectations" on all rating criteria and deemed the check ride "acceptable."

Def.'s Reply, Ex. A [Dkt. #39-1].

The Agency gave Anakor feedback and the opportunity to improve following her

October 2009 evaluation.  Anakor participated in three check rides during November and

11

December, the latter two of which were intended to give her additional opportunities to show improvement. Hovde Depo. at 153:9-154:3. Anakor argues that she "was progressively improving in her check rides" after her October 2009 evaluation, Pl.'s Opp'n at 6, but unfortunately for plaintiff, she did not improve enough. The fact remains that she did not fully meet expectations in any of those rides. Plaintiff does not dispute that "failure to perform at an acceptable level in any one of the critical elements can result in termination of an investigator and/or a decision not to convert an intern into a full-time employee."[6] Def.'s SOMF ¶ 5.

Further, Kaplansky declined to convert at least two other individuals from temporary to permanent employees during her time at the agency, and they were both males who appeared to be Caucasian. Hovde Depo. at 155:13-156:3. She also proposed the removal of a full-time investigator, though she does not know what ethnicity he appeared to be. *Id*. at 156:15-157:3. Ultimately, there is no evidence such that a jury could find Anakor was singled out on the basis of her national origin.

## II.   *Disability Association Discrimination*

Plaintiff readily acknowledges that she does not have a disability herself. Anakor Depo. at 36:13-14. Instead, in her Complaint, Anakor alleges that she was discriminated against on the basis of her caregiving responsibilities. Compl. ¶¶ 49-58. Plaintiff maintains that her claim is one of discrimination based on association with a disabled

---

[6] Whether or not check rides were part of the evaluation of the critical element of "investigative competencies" only, *see* Pl.'s Opp'n, Ex. 5 [Dkt. #38-1], or were evaluated as part of "quality," *see* July 22, 2014 Deposition of Patrick Green, Pl.'s Opp'n, Ex. 8 at 32:12-14 [Dkt. #38-1] ("Q: [U]nder which section of the annual review would a Check Ride Assessment be evaluated? A: The critical element of quality."), is beside the point. Unacceptable performance on a check ride would still factor into assessment of a critical element.

person, as prohibited by the ADA in 42 U.S.C. § 12112(b)(4). Pl.'s Opp'n at 12-13.

This provision prohibits "excluding or otherwise denying equal jobs or benefits to a

qualified individual because of the known disability of an individual with whom the

qualified individual is known to have a relationship or association." 42 U.S.C.

§ 12112(b)(4). Even assuming Anakor properly alleged an association discrimination

claim in her Complaint, she cannot prevail.

There is simply no evidence in the record to suggest that the Agency chose not to

convert Anakor to a permanent position because her daughter had kidney disease.

Anakor does not point to any evidence indicating that the Agency had any problems with

her being associated with a child with kidney disease or any other disability. Indeed,

Anakor's caregiving responsibilities were accommodated, even though the disability

association provision does not require employers to make reasonable accommodations for

those associated with a disabled person. *See Den Hartog v. Wasatch Acad.*, 129 F.3d

1076, 1084 (10th Cir. 1997). The Agency granted her a temporary duty assignment and

extended that assignment upon her request; plaintiff did not ask for a further extension or

formally request FMLA leave. Under these facts, a jury could not find that Anakor's

association with a disabled person was the reason the Agency did not make her

appointment permanent.

## III.    *Retaliation*

Finally, plaintiff has not produced evidence such that a jury could find that the

Agency actually decided not to convert Anakor as retaliation for protected EEO activity.

Anakor alleges that she contacted an EEO counselor on December 11, 2009, and filed a

formal Complaint on December 31, 2009. Compl. ¶ 60. She also makes the conclusory allegation that her termination "was directly related to Plaintiff's protected activity." *Id.* ¶ 62. However, she does not even allege, let alone offer any evidence in the record, that Kaplansky or anyone else in the Agency was aware of her protected activity prior to her termination.

Plaintiff states in her opposition that "Kaplansky was [sic]of the complaint by the time she conducted the last check ride evaluation on December 22, 2014[sic]" and that the EEO office had "issued notice of mediation before Kaplansky finalized the termination of Plaintiff." Pl.'s Opp'n at 14-15. Even if the first statement were read generously to claim that Kaplansky was aware of the EEO complaint prior to her last check ride evaluation, there is no evidence in the record to support these assertions, which were not alleged in the Complaint. Without evidence that Agency decision-makers *knew* about any protected EEO activity by Ankor, a jury could not conclude that the Agency actually made its employment decision as retaliation for such activity.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment [Dkt. #28] is GRANTED. An appropriate order shall accompany this Memorandum Opinion.

RICHARD J. LEON
United States District Judge